E-FILED
Friday, 08 July, 2005 09:50:03 AM
U.S. District Court, ILCD

# United States District Court

| CENTRAL | DISTRICT OF | ILLINOIS |

UNITED STATES OF AMERICA

v.

CHAUNCEY WHITAKER

**CRIMINAL COMPLAINT**

CASE NUMBER: 05- 3043- m

*FILED JUL -7 2005 JOHN M. WATERS, Clerk U.S. DISTRICT COURT CENTRAL DISTRICT OF ILLINOIS*

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about April 25 and May 9, 2005 in Morgan County, in the Central District of Illinois, the defendant:

knowingly and intentionally distributed cocaine base ("crack"),
the amount involved on May 9, 2005, being at least five grams,

in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B).

I further state that I am an DEA Task Force Agent and that this complaint is based on the following facts:
                              Official Title

See attached affidavit

Continued on the attached sheet and made a part hereof:  ■ Yes   ☐ No

s/ James F. Jackson
Signature of Complainant

Sworn to before me and subscribed in my presence,

July 7, 2005                              at   Springfield, Illinois
Date                                           City and State

Byron G. Cudmore                          s/ Byron G. Cudmore
U.S. Magistrate Judge
Name & Title of Judicial Officer               Signature of Judicial Officer

STATE OF ILLINOIS        )
                         )   ss
COUNTY OF MORGAN         )

## AFFIDAVIT

I, James F. Jackson, your affiant, being first duly sworn, hereby depose and state:

1.   Your affiant is a special agent (SA) with the Illinois State Police (ISP), currently assigned as a task force agent (TFA) with the Drug Enforcement Administration (DEA), Springfield, Illinois Resident Office. I have been employed with the ISP since March of 1997. Previously I was a Deputy Sheriff at the Morgan County Sheriff's Department, assigned to the Central Illinois Enforcement Group from 1991 until 1997. I have been a deputized TFA with the DEA for approximately 7 months. I have received specialized training in various aspects of illicit drug investigations, which include, but are not limited to the following: interviewing defendants and witnesses, surveillance techniques, and money laundering. I have prepared numerous criminal affidavits, executed search warrants, and testified at criminal trials during my participation in multiple drug investigations.

2.   This affidavit is made in support of an application for a complaint charging **Chauncey WHITAKER** with distribution of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). A warrant for his arrest is requested.

3.   I am familiar with the following facts based upon my personal investigation, the investigation of other law enforcement officers, or information officially furnished to me by other law enforcement officers, witnesses, or CS. All references to cooperative sources will be referred to in both the masculine and feminine genders regardless of the actual gender of the CS.

4.   During March and April of 2005 I received various complaints from concerned citizens of the Jacksonville and Morgan County, Illinois areas regarding increases in crack cocaine dealings and

gun-related violence associated with this activity. A meeting was held between the Springfield DEA Office, United States Attorney's Office, ISP, Jacksonville Police Department, Morgan County Sheriff's Department, and the Morgan County State's Attorney's Office. It was discovered that the problem of crack cocaine dealing in these areas was directly related to numerous violent crimes including homicides, robberies, property theft, and fraud. The meeting additionally identified several mid and upper street level crack cocaine dealers, as well as corresponding addresses where the majority of this illegal activity had transpired throughout Jacksonville, Illinois, located in the Central District of Illinois. A course of action was determined in an effort to effectively address this problem. The course of action included a detailed law enforcement operation, in which agents and officers of the DEA and ISP would utilize numerous investigative methods including the use of confidential sources (CS) of information to conduct controlled purchases of illicit substances, stationary and mobile surveillance, and interviews and the consensual recording of telephone calls.

5.      In April of 2005, an ISP CS (hereafter referred to as CS-1) provided the Springfield, Illinois DEA Resident Office with illicit drug activity intelligence related to WHITAKER. CS-1 indicated that he/she had learned during an earlier encounter with WHITAKER that he (WHITAKER) was allegedly selling crack cocaine throughout the Jacksonville, Illinois area. Based on information that is currently available, CS-1 has a number of prior misdemeanor and felony convictions including theft and forgery, and is cooperating with law enforcement because he/she has been charged at the State level with misdemeanor theft and hopes to earn a reward relating to her sentencing decisions. CS-1 reported that WHITAKER had indicated to him/her that he (WHITAKER) would be willing to sell a quantity ranging from 1 gram to 1/4 ounce of crack cocaine to CS-1.

6.      On <u>04-25-05</u>, CS-1 met with agents for the purpose of making a controlled purchase of drugs from WHITAKER. At a pre-arranged meeting location CS-1 was searched by ISP Inspector Cordery

for contraband with negative results, and DEA SA Frank Sampson searched CS-1's vehicle for contraband with negative results. Audio recording and radio transmission devices were concealed on CS-1, and CS-1 was provided with $200 of pre-serialized United States currency. CS-1 was then followed by surveillance agents directly to a residence, known by ISP Inspector Heise as being WHITAKER's through a previous stolen firearm investigation, at 1144 South Main Street in Jacksonville. On the way, CS-1 did not meet anyone, drop anything off, or pick anything up.

7. Surveillance agents observed CS-1 arrive at the residence. Agents monitoring the audio transmission device heard CS-1 state, "Damn, Chaunce! How come you didn't answer your phone? You asleep?" WHITAKER replied, "Yeah." CS-1 then stated, "I need a ball. I need it right now." implying a 1/8 ounce quantity of crack cocaine. After a brief period of time, surveillance agents observed CS-1 exit the residence and depart the area in his/her vehicle.

8. Surveillance agents followed CS-1 directly back to the pre-arranged location, and along the way CS-1 did not meet anyone, drop anything off, or pick anything up. At the meeting location, CS-1 handed agents a plastic bag containing the purported crack cocaine. CS-1 and his/her vehicle were searched for contraband with negative results. Based on my training and experience, the substance in the plastic bag that CS-1 relinquished appeared to be crack cocaine. Subsequent analysis by the DEA North Central Laboratory determined that the substance consisted of **2.6 grams of cocaine base**.

9. CS-1 reported that when he/she arrived at WHITAKER's residence, WHITAKER met him/her at the back door and let him/her inside. CS-1 said he/she asked WHITAKER for an 8-ball (common slang for 1/8 ounce). WHITAKER left CS-1 in the kitchen and moved out of sight toward the front of the residence. WHITAKER returned with a plastic bag containing what CS-1 estimated was approximately one ounce of crack cocaine. WHITAKER placed a portion of the crack cocaine

on a digital scale, and CS-1 observed that the scale indicated 3.2 grams. CS-1 said he/she provided WHITAKER with the $200 in currency.

10. On <u>05-09-05</u>, CS-1 met with agents for the purpose of making another controlled purchase of drugs from WHITAKER. At a pre-arranged meeting location CS-1 was searched by Inspector Cordery for contraband with negative results, and ISP Trooper Tim Hanson searched CS-1's vehicle for contraband with negative results. CS-1 paced a recorded telephone call to WHITAKER at (217)-831-6006 and made arrangements to meet him at Jacksonville Community Park across from the 1000 block of South Main Street in Jacksonville, Illinois. Audio and video recording devices were concealed on CS-1, and CS-1 was provided with $450 pre-serialized United States currency. CS-1 was then accompanied by Inspector Cordery and followed by surveillance agents directly to Jacksonville Community Park. On the way, CS-1 did not meet anyone, drop anything off, or pick anything up.

11. Shortly thereafter, CS-1 was observed by surveillance agents meeting WHITAKER (whom I recognized from previous contacts) in the park. Inspector Cordery reported that WHITAKER (whom she identified from a known photograph) was driving a purple car bearing Wisconsin license plates, with Kelly BIGGS (also identified from a known photograph) in the front passenger seat. WHITAKER said he need to go to another location, and drove away. Surveillance agents saw WHITAKER drive about a block, turn around, and return back to where CS-1 was parked. Inspector Cordery reported that WHITAKER pulled up next to the driver's side of the car driven by CS-1, facing in the same direction. After a conversation between CS-1 and WHITAKER in which reference was made to "two," and WHITAKER indicated he had two big ones, CS-1 got out and stood next to the passenger door of WHITAKER's vehicle, blocking Inspector Cordery's view. Then, CS-1 got back in his/her vehicle and departed. From a pocket, CS-1 produced two plastic bags

containing apparent crack cocaine.

12. Accompanied by Inspector Cordery, CS-1 was followed by surveillance agents directly back to the pre-arranged location. Along the way, CS-1 did not meet anyone, drop anything off, or pick anything up. At the meeting location, CS-1 handed agents two plastic bag containing the purported crack cocaine. CS-1 and his/her vehicle were searched for contraband with negative results. Based on my training and experience, the substance in the plastic bags that CS-1 relinquished appeared to be crack cocaine. Subsequent analysis by the DEA North Central Laboratory determined that the substance consisted of **6.3 grams of cocaine base**.

13. A review of audio and video recording captured from hidden equipment placed on CS-1's person indicates CS-1 stating to WHITAKER, among other things, "You should give me a deal." WHITAKER then replied, "You're gettin' a deal… It's supposed to be four fifty," meaning that the normal price for that quantity of crack cocaine should be $450.00. WHITAKER then questioned CS-1, "Powder, too?" inquiring if CS-1 wanted to purchase powder cocaine as well.

s/ James F. Jackson
James F. Jackson, Task Force Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this ___ day of July, 2005.

s/ Byron G. Cudmore
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE